**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA**

In re: DUMACE LEONARD LEGRAND,　）　　Case No. 19-21198-C-7
　　　　　　　　　　　　　　　　）
　　　　　　　　Debtor.　　）　　Dkt. Control No. SJT-1
_____）

**OPINION**

**Before: Christopher M. Klein, Bankruptcy Judge**
————————————

Susan J. Turner, River City Law, Sacramento, CA, for Debtor

Laura McCarthy Hoalst, Winn Law Group, Fullerton, CA, for
Respondents Cavalry Portfolio Services, Cavalry SPV-1, LLC, &
Winn Law Group　　　　　　　————————————

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

"No fair ground of doubt as to whether the [bankruptcy discharge] order barred the creditor's conduct" warrants civil contempt says the Supreme Court.  Taggart v. Lorenzen, 139 S.Ct. 1795 (2019).  This is such a case.

Although civil contempt for discharge violations is warranted, the automatic stay remedy under 11 U.S.C. § 362(k)(1) applies because the series of offending wage garnishments began before discharge at the behest of debt collectors who had no sense of urgency about obeying the law.  Civil contempt's milder remedies do not eclipse the stronger medicine of § 362(k)(1).

There would have been no violations if the respondents had terminated their earnings withholding order before "closing" their files and sticking their heads in the sand.  Debt collectors have an affirmative duty upon learning of bankruptcy to terminate garnishments they have launched.

The stay-violating conduct having been "willful" within the meaning of § 362(k)(1) and there also being "no fair ground of doubt as to whether" the automatic stay and the discharge injunction barred the garnishments, § 362(k)(1) stay violation remedies, including punitive damages, are appropriate.

## Facts

Cavalry SPV I, LLC, as assignee of Citibank, N.A. ("Cavalry"), obtained a $20,791.07 money judgment against Dumace LeGrand in a California state court.

A Writ of Execution directed to the Sheriff of Los Angeles County was issued January 8, 2019.

An Application for Earnings Withholding Order and an Earnings Withholding Order ("EWO") were prepared January 30, 2019, on official California forms on behalf of Cavalry by its attorney, Winn Law Group ("Winn"), filed February 4, 2019, and served on LeGrand's employer on February 5, 2019.

Winn advertises its expertise in debt collection matters as the "premier creditor's rights firm in California."[1]

The Employer's Return form on the EWO reported gross earnings of $1,008.00 during the last weekly pay period. It further reported in Item 5 that "employer has received another order affecting the employee's earnings and earnings are being withheld for this other order because this order does not have higher priority." The other order was described as "CA Child

---

[1] Website: "Winn Law Group is the premier creditor rights law firm in California." http://www.winnlawgroup.com/about (viewed January 21, 2020).

Support, Case 15FL00805MOD4, currently $216.48 weekly."

The Employer's Return did <u>not</u> check the box: "This order is not effective for the reason shown in Item 5. It is returned to the levying officer with this return." Thus, the Employer's Return made clear that it was retaining the order, which is the result contemplated by California Code of Civil Procedure § 706.030(c)(3) when there is extant withholding for support.

Cavalry and Winn received the Employer's Return dated February 14, 2019, noting the existing withholding for support.

LeGrand filed chapter 7 case No. 2019-21198 on February 28, 2019. His chapter 7 discharge was entered June 17, 2019. The chapter 7 case was closed June 24, 2019.

Cavalry and Winn were listed as creditors and admit that they had notice of the case and of the discharge.

Upon learning of the filing of the chapter 7 case, Cavalry and Winn "closed" their files, but they did not terminate Cavalry's EWO even though they admit that they had an affirmative duty to do so. Nor is it controverted that they knew from the Employer's Return that their EWO had been retained by LeGrand's employer and, thus, remained potentially effective.

LeGrand's employer did not have notice of the existence of his bankruptcy case until June 28, 2019, eleven days after his discharge was entered.

The employer honored Cavalry's EWO for payrolls of May 22, June 19, June 26, July 3, July 10, July 17, and August 7, 2019, for a total of $883.35.

On July 10, 2019, LeGrand's counsel sent to Winn a letter by fax transmission (which was received) demanding immediate

termination of the garnishment, return of collected funds, $500.00 in damages, and $500.00 in attorney's fees. Her letter stated an intent to pursue formal action if there was no resolution by July 15, 2019. She followed her letter with repeated futile attempts to talk with Winn by way of voicemail messages requesting that her calls be returned.

Winn did not respond to the July 10 letter from LeGrand's counsel, did not respond to counsel's voicemail messages, and did not otherwise attempt to communicate with her before she filed and served the motion for sanctions and fees on July 26, 2019.

On July 29, 2019, Winn executed, for Cavalry, a Notice of Termination of EWO and sent a copy to LeGrand's counsel. This was Winn's first communication to LeGrand's counsel.

The Notice of Termination was directed to the Los Angeles County Sheriff, who supposedly terminated the EWO on August 2, 2019, but not in time to prevent another garnishment on August 7.

This court issued an Order to Show Cause why Cavalry and Winn should not be held in civil contempt or otherwise sanctioned for violating the automatic stay and the discharge injunction.

<u>Analysis</u>

Assessing the questions of automatic stay violation, civil contempt, and their consequences requires an excursion through the California wage garnishment statute.

I

California wage garnishment procedure is prescribed by Chapter 5 of the California Code of Civil Procedure. CAL. CODE

1  Civ. Pro. §§ 706.010 - 706.154.

2

3                                    A

4      The dramatis personae include "judgment creditor," "judgment

5  debtor" (aka "employee"[2])," "employer,"[3] and the "levying

6  officer" (Sheriff or authorized public officer).

7

8                                    B

9      The key concepts relevant here are "earnings,"[4] "disposable

10 earnings,"[5] "writ of execution," "earnings withholding order,"[6]

11

12

13 ───────────────────

14      [2]"Employee" includes "any individual who performs services
   subject to the right of the employer to control both what shall
   be done and how it shall be done." Cal. Code Civ. Pro.
15 § 706.011(e).

16      [3]"'Employer' means a person for whom an employee performs
   services as an employee." Cal. Code Civ. Pro. § 707.011(f). And,
17 "'Person' includes an individual, a corporation, a partnership or
   other unincorporated association, a limited liability company,
18 and a public entity." Cal. Code Civ. Pro. § 706.011(i).

19      [4]"'Earnings' means compensation payable by an employer to an
20 employee for personal services performed by such employee,
   whether denominated as wages, salary, commission, bonus, or
21 otherwise." Cal. Code Civ. Pro. § 706.011(b).

22      [5]"'Disposable earnings' means the portion of an individual's
   earnings that remains after deducting all amounts required to be
23 withheld by law." Cal. Code Civ. Pro. § 706.011(a).

24      [6]A writ of execution is prerequisite to obtaining an
25 earnings withholding order: "If a writ of execution has been
   issued in the county where the judgment debtor's employer is
26 required to be served and the time specified in subdivision (b)
   of Section 699.530 for levy on property under the writ has not
27 expired, a judgment creditor may apply for the issuance of an
   earnings withholding order by filing an application with a
28 levying officer in such county who shall promptly issue an
   earnings withholding order." Cal. Code Civ. Pro. § 706.102(a).

"employer's return," "levy of execution,"[7] "lien created by

service of earnings withholding order,"[8] "withholding period,"[9]

"priority of earnings withholding order,"[10] "withholding order

for support,"[11] "ineffective earnings withholding order,"[12]

---

[7]"[A] levy of execution upon the earnings of an employee shall be made by service of an earnings withholding order upon the employer."  CAL. CODE CIV. PRO. § 706.021.

[8]"Service of an earnings withholding order creates a lien upon the earnings of the judgment debtor that are required to be withheld pursuant to the order and upon all property of the employer subject to the enforcement of a money judgment in the amount required to be withheld pursuant to such order.  The lien continues for a period of one year from the date the earnings of the judgment debtor become payable unless the amount required to be withheld pursuant to the order is paid as required by law."  CAL. CODE CIV. PRO. § 706.029.

[9]"'[W]ithholding period' means the period which commences on the 10th day after service of an earnings withholding order upon the employer and which continues until the earliest of the following dates:
    (1) The date the employer has withheld the full amount required to satisfy the order.
    (2) The date of termination specified in a court order served on the employer.
    (3) The date of termination specified in a notice of termination served on the employer by the levying officer.
    (4) The date of termination of a dormant or suspended earnings withholding order as determined pursuant to Section 706.032."  CAL. CODE CIV. PRO. § 706.022(a).

[10]The rule is first in time, first in right:  "An employer shall comply with the first earnings withholding order served upon the employer."  CAL. CODE CIV. PRO. § 706.023(a).

[11]"A 'withholding order for support' is an earnings withholding order issued on a writ of execution to collect delinquent amounts payable under a judgment for the support of a child, or spouse or former spouse, of the judgment debtor."  CAL. CODE CIV. PRO. § 706.030.

[12]An "ineffective" earnings withholding order results "[i]f the employer is served while an employer is required to comply with another earnings withholding order with respect to the earnings of the same employee, in which event the subsequent order that is "ineffective" until the prior order is terminated.

"dormant EWO," and "suspended EWO."

A cousin not governed by the Wage Garnishment Law is the "earnings assignment order for support," which, as an assignment, has superpriority over all EWOs.[13]

C

The lien created by service of an EWO puts the employer at risk of liability for so long as the EWO remains in the hands of the employer.  In addition to being a lien on the employee's wages, it constitutes a lien on employer's property in the amount required to be withheld.  CAL. CODE CIV. PRO. § 706.029.

D

Situations involving multiple EWOs receive three alternative treatments under the California Wage Garnishment Law.

1

First, the usual rule is that EWOs of equal priority are honored seriatum – first come, first served.  If one such EWO is in force when the employer receives a second EWO of equal or lesser priority, the second EWO is "ineffective" and is returned

_____

CAL. CODE CIV. PRO. § 706.23(c).

[13]"'Earnings assignment order for support' means an order, made pursuant to Chapter 8 (commencing with Section 5200) of Part 5 of Division 9 of the Family Code or Section 3088 of the Probate Code, which requires an employer to withhold earnings for support."  CAL. CODE CIV. PRO. § 706.011(d).  They are not governed by the Wage Garnishment Law, are not "earnings withholding orders," and have priority over any EWO.  ALAN M. AHART, CALIFORNIA PRACTICE GUIDE: ENFORCING JUDGMENTS AND DEBTS § 6:1219 (Rutter Group 2005) (AHART, ENFORCING JUDGMENTS).

to the levying officer to await a subsequent levy after the first

EWO is paid in full.  CAL. CODE CIV. PRO. § 706.023(c).[14]

Or, second, if the second-arriving EWO is senior in

priority, then an EWO already in effect becomes "suspended" while

the priority order is paid but remains in the hands of the

employer to be resumed when the priority EWO is paid in full.

CAL. CODE CIV. PRO. §§ 706.022(a)(4) &  § 706.032(a)(2).[15]

Or, third, when support is involved, an employer withholds

earnings simultaneously pursuant to an EWO for support (or

earnings assignment order for support) and another EWO.  CAL. CODE

CIV. PRO. § 706.030(c)(3).[16]

Why the simultaneous treatment?  Simple.  There is a

---

[14]"If an earnings withholding order is served while an employer is required to comply with another earnings withholding order with respect to the earnings of the same employee, the subsequent order is ineffective and the employer shall not withhold earnings pursuant to the subsequent order ..."  CAL. CODE CIV. PRO. § 706.023(c).

[15]"'Withholding period' means the period which commences on the 10th day after service of an earnings withholding order upon the employer and which continues until the earliest of the following dates: ... (4) The date of termination of a dormant or suspended withholding order as determined pursuant to Section 706.032."  CAL. CODE CIV. PRO. § 706.022(a).

"(a) Except as otherwise provided by statute: ... (2) If withholding under an earnings withholding order ceases because the judgment debtor's earnings are subject to an order or assignment with higher priority, the earnings withholding order terminates at the conclusion of a continuous two-year period during which no amounts are withheld under the order."  CAL. CODE CIV. PRO. § 706.032(a)(2).

[16]"(c) Notwithstanding any other provision of this chapter: ... (3) Subject to paragraph (2) and to Article 3 [Restrictions on Earnings Withholding] (commencing with Section 706.050), an employer shall withhold earnings pursuant to both a withholding order for support and another earnings withholding order simultaneously."  CAL. CODE CIV. PRO. § 706.030(c)(3).

statutory limit to the amount that may be withheld per pay period, typically 25 percent of disposable income. CAL. CODE CIV. PRO. §§ 706.050 - 706.052.

Consider, as an example, a $300.00 withholding limit due to disposable income of $1,200.00. If there is a priority support order (earnings assignment order or EWO for support) for $250.00, then the remaining $50.00 is available for the non-support EWO.

But if earnings for a particular pay period do not permit withholding more than the support amount, then there is nothing for the EWO to capture and, hence, that EWO is said to be "dormant." CAL. CODE CIV. PRO. § 706.022(a)(4). The "dormant" EWO lays to the side ready to pounce whenever there is an amount that can be withheld in excess of the support amount.

In other words, when an EWO for support and an EWO are simultaneously in effect, the amount required to be withheld for support is deducted first and the amount, if any, for the non-support EWO is determined by subtracting the support amount from the total amount that could otherwise be withheld under a non-support order. AHART, ENFORCING JUDGMENTS §§ 6:1224-25.

In scenarios two ("suspended" EWO) and three ("dormant" EWO), the employer retains an EWO until it terminates.

2

The facts of this case suggest that the third scenario applied, which permits simultaneous withholding. The employer, in light of exposure to the attendant lien, likely would have returned Cavalry's EWO as ineffective if it could have done so.

It appears that what happened is that initially LeGrand's income was less than or equal to the support order, and that Cavalry's EWO lay "dormant."  When LeGrand began to work overtime in May 2019, the increase in income had the effect of raising the limit on what could be garnished above the sum needed to honor the support order, at which point Cavalry's "dormant" EWO pounced on the surplus available to withhold.

Therein lies the answer to the question, "Why no withholding before May 22 on Cavalry's EWO?"  Answer: no increased income until the May 22 payroll.  LeGrand's overtime averaged 23.35 hours per week for the seven weeks in question.[17]

E

Cavalry and Winn suggest in defense that an objectively reasonable basis for their inaction ensues from "irregular" procedure because their EWO was not immediately returned by the employer as ineffective.  As there was no irregularity, that defense is unavailing, especially among expert debt collectors.

Several inescapable facts belie any irregularity supporting an objectively reasonable explanation.  Cavalry and Winn knew that their EWO was retained by the employer.  They also knew that § 706.030(c)(3) requires simultaneous withholding where withholding for support is involved.  They also knew that the prior order involved family support.  They also knew that their

---

[17]The pay advices for the payment dates May 22, June 19, June 26, July 3, July 10, July 17, and August 7 reflect overtime at an average of 23.35 hours for those seven weeks.  The support for those weeks was $241.84/week, instead of the $216.48/week reported in the Employer's Return the previous February 14.

EWO would remain effective for up to two years.  They also knew that the debtor had filed a bankruptcy case triggering the automatic stay and then had received a discharge triggering the discharge injunction.  They also knew they had an affirmative duty to ensure that their "dormant" EWO would not cause any garnishment violating the automatic stay or discharge injunction.

Finally, after learning on July 10, 2019, that their "dormant" EWO was triggering garnishments, and with knowledge of the automatic stay violation beginning with the May 22 garnishment and with knowledge of the discharge injunction, they waited nineteen days to terminate their EWO on July 29, 2019, three days after debtor's counsel filed the instant motion.

Conspicuously absent from the response by Cavalry and Winn is any attempt to explain, extenuate, or excuse their nineteen-day delay in terminating their EWO.

In short, there is no objectively reasonable basis for concluding that the conduct of Cavalry and Winn might be lawful.  Enforcement of their "dormant" EWO in the face of the automatic stay before discharge exposes them to § 362(k)(1).


II

Automatic stay violation remedies are prescribed by § 362(k)(1) for victims who are individuals.[18]  Congress provided that the court may award actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive

---

[18]Civil contempt also applies to § 362 stay violations, regardless of whether the victim is an individual.  Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1189-90 (9th Cir. 2003).

1  damages.   11 U.S.C. § 362(k)(1).

2

3                              A

4      Stay violation liability under § 362(k)(1) continues until

5  full restitution is actually made or, if after expiration of the

6  stay, until the court orders full restitution.   <u>Snowden v. Check</u>

7  <u>Into Cash of Wash., Inc. (In re Snowden)</u>, 769 F.3d 651, 659 & 662

8  (9th Cir. 2014); <u>Sundquist v. Bank of America, N.A. (In re</u>

9  <u>Sundquist)</u>, 566 B.R. 563, 586 (Bankr. E.D. Cal. 2017).

10

11                              B

12     The willfulness of the stay violation is a question of fact.

13  <u>Eskanos & Adler, P.C. v. Leetien (In re Leetien)</u>, 309 F.3d 1210,

14  1213 (9th Cir. 1992).   This instance entails multi-step analysis.

15     When the automatic stay came into effect as a consequence of

16  the filing of LeGrand's voluntary chapter 7 filing, Cavalry's EWO

17  was in the hands of the employer in a "dormant" status.   The EWO

18  was effective and potent to the extent that whenever LeGrand's

19  disposable income within garnishment limits exceeded his family

20  support obligation then the Cavalry EWO would be honored.

21     Cavalry's EWO, like what the military has variously known as

22  booby trap, surprise firing device, IED, or land mine awaited

23  automatic detonation by the stimulus of surplus income.

24     Cavalry and Winn knew of the bankruptcy filing and of the

25  automatic stay, knew that their EWO remained effective to trigger

26  a withholding upon the occurrence of increased income, and knew

27  that the correct way to disarm the EWO was to terminate it.

28

One might debate whether Cavalry and Winn willfully violated the automatic stay when they did not immediately terminate their EWO upon learning of the bankruptcy filing and the automatic stay, or, instead, when the EWO actually captured some surplus wages.  In either event, it counts as "willful."

A creditor who knows of the automatic stay and has the power to revoke some contingent action that would violate the stay but declines to do so acts "willfully" for purposes of § 362(k)(1).

It follows that Cavalry and Winn were "willful" in their violations of the automatic stay.

III

What of the fact that some of Cavalry's garnishments occurred after the discharge was entered?

As the Supreme Court has made explicit, bankruptcy courts have civil contempt authority for discharge violations derived from the conjunction of § 524(a)(2) and § 105(a).  11 U.S.C. §§ 105(a) & 524(a)(2); Taggart, 139 S.Ct. at 1801.

A

The usual remedy for discharge injunction infractions are limited to civil contempt.  The appropriate parameters of civil contempt in any given situation are fact intensive.

Civil contempt sanctions are designed to coerce compliance and to compensate for losses, including costs and attorneys' fees, stemming from noncompliance with the injunction.  Taggart, 139 S.Ct at 1801; United States v. Utd. Mine Workers of Am., 330 U.S. 258, 303-04 (1947); Dyer, 322 F.3d at 1192; In re Dickerson,

13

510 B.R. 289, 297-98 (Bankr. D. Id. 2014).

Taggart clarifies that the standard to find civil contempt is objective, but subjective good or bad faith may affect the size of the range of losses attributable to noncompliance with the injunction. Bad faith may widen the range of what is compensatory. Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) ($996,644.65). Good faith may narrow the range. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 801 (1987).

In addition to coercion and compensation, civil contempt may, if necessary, include "relatively mild" non-compensatory fines tailored to rule enforcement. Dyer, 322 F.3d at 1193; Dickerson, 510 B.R. at 298.

In sum, the degree of sanctions other than compensation is limited to the least possible exercise of power adequate to the end of preventing repetition. Taggart, 139 S.Ct. at 1802.

B

When, as here, a violation of the discharge injunction is merely continuation of pre-discharge conduct that violated the automatic stay, § 362(k)(1) continues to provide stronger, more explicit, and more definite statutory remedies that are more adequate to the task than the least-possible-exercise-of-power restriction on civil contempt.

An automatic stay violation that continues post-discharge remains eligible for § 362(k)(1) remedies, including actual damages, costs and attorneys' fees, and, punitive damages, until the stay violation is purged by actual restitution. Snowden, 769 F.3d at 659 & 662; Sundquist, 566 B.R. at 586.

It would be an odd system that strips an individual debtor of the potent § 362(k)(1) statutory punitive damages remedy against a creditor violating the automatic stay in bad faith but then holds that, because the stay violation persisted past entry of discharge, the § 524 discharge injunction insulates that same bad actor with civil contempt's milder least-possible-exercise-of-power approach of civil contempt.

IV

Under either the § 362(k)(1) regime for automatic stay violations or the civil contempt regime for discharge injunction violations, the relative good or bad faith of the defendant is relevant to fashioning the award. And, in the case of § 362(k)(1), such analysis is vital to the question of whether circumstances are "appropriate" for punitive damages.

A

We begin by positing the baseline for what would have been a good faith response to notice the automatic stay was being violated.

The good faith response to the July 10 letter faxed to Cavalry's counsel by LeGrand's counsel would have been an immediate message or telephone call to the effect: "There must have been a mistake. We apologize. We are immediately investigating to correct the situation by making sure our EWO is terminated and promise to make the debtor whole."

If that good faith response had been made, then the attorneys' fee component of damages would have been low and

punitive damages would be less likely to be awarded.

B

That good faith response was not what happened.  The facts are more indicative of lack of good faith.

1

Cavalry and Winn did nothing for nineteen days after receiving formal notice from debtor's counsel – no call to debtor's counsel, no email to debtor's counsel, no letter to debtor's counsel, no effort towards terminating the EWO.  No effort to act like reasonable adults.  Meanwhile, at least two more withholdings occurred.

Nor can Cavalry and Winn hide behind honest mistake.  They knew the law regarding "dormant" EWOs linked to support obligations ("premier creditor's rights firm in California"). They knew as of the Employer's Return of February 14 that they had a "dormant" EWO lodged with the employer that would remain effective for two years.  They admitted in open court that they knew they had an affirmative duty to terminate that EWO.  When they received notice of entry of discharge, they knew that no theory of law would validate that "dormant" EWO.[19]

---

[19]They may have been betting that the chapter 7 case would be dismissed before entry of discharge so that the "dormant" order would retain vitality and betting that there would be no surplus income available to garnish while the automatic stay was in effect.  As it turned out, they lost both bets.  The case was not dismissed and there were garnishments while the automatic stay was in effect.  Now it is time to pay up under § 362(k)(1).

1  Despite all that knowledge, it was not until after receipt

2  by Cavalry and Winn of the debtor's sanctions motion filed and

3  served by mail on day sixteen after the July 10 notice that

4  Cavalry and Winn acted to terminate their EWO.

5  This smacks of a passive-aggressive mindset of doing nothing

6  on the chance that debtor's counsel may not figure out how to

7  initiate a legal action or may back off out of concern for

8  expense.  Perhaps that is a useful collection strategy elsewhere.

9  But in the face of the bankruptcy automatic stay and the

10 discharge injunction, it amounts to playing with fire.

11  Bottom line: no inference of good faith on those facts.

12

13                                  2

14  The papers presented by Winn materially misstate key facts

15 so as to hide its nineteen-day delay.

16  The fact is that Winn received the faxed letter from the

17 debtor's counsel on July 10 and did nothing by way of response

18 and ignored all telephone calls until July 19 when, after Winn

19 had received mail service of the debtor's motion for sanctions,

20 Winn issued a termination of the earnings withholding order.

21  That chronology adds up to a nineteen-day stonewall by Winn

22 with knowledge of on-going violation of the discharge injunction,

23 which led to at least two additional garnishments.  Winn has

24 explaining to do, but curiously makes no attempt to do so.

25  Winn dodges mention of its nineteen-day stonewall nine times

26 with statements implying it acted promptly.  For example:  "Winn

27 terminated the levy upon review of the letter from debtor's

28

17

counsel, prior to receipt of any funds."[20]

All in all, those statements are designed to cover up Winn's nineteen-day delay and are indicative of less than good faith.

3

Respondent's papers materially misstate the law by way of selective citations that focus on a general rule and omit mention of the applicable exception.  There is no mention of the section

---

[20]Declaration of Laura McCarthy Hoalst, ¶ 13.  The other eight statements are:

"Upon notice of the employer's enforcement of the earnings withholding order, Winn terminated the levy and instructed the sheriff to release any funds to the debtor."  Response to Order to Show Cause, p.2, *ll*.18-19.

"The file remained closed until debtor's counsel, Sharon [Susan] Turner, contacted this office regarding the execution.  As of that date, no funds had been received from the sheriff, and a termination of the execution was sent to the sheriff on July 29, 2019."  Memorandum of Authorities, p.2, *ll*.12-14.

"Upon learning of the belated enforcement of the wage levy, Winn issued a termination of the execution on July 29, 2019, instructing any funds to be returned to the debtor."  Memorandum of Authorities, p.3, *ll*.13-15.

"Upon being made aware, Winn terminated the levy."  Memorandum of Authorities, p.5, *ll*.7-8.

"Any delay in issuing the termination was without intent and knowledge that the employer enforced the executed [sic] approximately three months after service."  Memorandum of Authorities, p.5, *ll*.12-14.

"As soon as the respondents learned of the garnishment, they terminated."  Hearing Transcript, p.7, *ll.11-12* (Atty Hoalst to court).

"As soon as Winn Law Group became aware of the situation, they terminated." Id., p.9, *ll*.7-8 (Atty Hoalst to court).

"As soon as we learned about it, we terminated it."  Id., p.21, *ll*.7-8.

1  that provides for simultaneous enforcement of withholding for

2  support and an EWO.  CAL. CODE CIV. PRO. § 706.030(c)(3).

3       Instead of citing and addressing the implications of

4  § 706.030(c)(3), notice of the applicability of which was

5  implicit in the Employer's Return that reported that the EWO was

6  <u>not</u> being returned as "ineffective," Winn hides from

7  § 706.030(c)(3) and perpetrates an exercise in misdirection

8  designed to create the misimpression that the subject

9  garnishments were the result of improper procedure.

10      Winn's brief cites only to § 706.023 rendering garden-

11 variety EWOs as "ineffective" in situations not involving a prior

12 support order and to § 706.104 governing the Employer's Return,

13 requiring return to the levying officer of an "ineffective" EWO.

14 Then the brief quotes the description of § 706.023 and § 706.104

15 in a prominent California treatise, AHART, ENFORCING JUDGMENTS

16 §§ 6:1215-16.  Memorandum of Authorities, pp.3-4.

17      As explained above, § 706.030(c)(3) simultaneous withholding

18 constitutes an exception to the general rule of priority in

19 § 706.023.  The same Ahart treatise, on which Winn relies, agrees

20 and accurately describes the exception regarding simultaneous

21 withholding.  AHART, ENFORCING JUDGMENTS §§ 6:1224-25.

22      Yet Winn blames something abnormal about the simultaneous

23 withholding prescribed by § 706.030(c)(3).[21]  All was correct.

24

25 [21]"No further action was taken to enforce the judgment after
   receipt of the notice [of bankruptcy].  This was because of the
26 employer's return indicating that there was already a support
   order received prior to the Cavalry writ.  <u>Under normal</u>
27 <u>procedure, the writ would not have been enforced.</u>"  Declaration
   of Laura McCarthy Hoalst, ¶ 7 (emphasis supplied).  In fact, the
28 procedure was correct and normal.

1    This court seriously doubts that "the premier creditor

2 rights law firm in California" innocently forgot to mention

3 § 706.030(c)(3) and innocently forgot to read and cite to the

4 court the next page of the Ahart treatise.

5    In fact, the Employer's Return in this instance noted that

6 there was a prior order for support and that Cavalry's EWO was

7 <u>not</u> being returned as "ineffective."

8

9                              V

10    Next comes the question of remedies.

11

12                              A

13    This court is persuaded by clear and convincing evidence

14 that Cavalry and Winn "willfully" violated the automatic stay by

15 not preventing the Cavalry EWO from being enforced on seven

16 occasions following the filing of the debtor's chapter 7 case, a

17 consequence which is that actual damages, including costs and

18

---

19    "In this case, it appears that the employer starting [sic]

20 enforcing the writ May 22, 2019, enforcing it after the prior
order expired or was satisfied.  <u>This was not proper procedure as</u>

21 <u>set forth in the Ahart, California Practice Guide.</u>"  Memorandum
of Authorities, p.4, *ll*.13-15 (emphasis supplied).  In fact, it

22 was precisely the proper procedure as described on the next page
of the Ahart treatise.

23

24    "Winn ... relied on the employer's return that it was
ineffective due to an existing levy."  <u>Id</u>., p.5, *ll*.11-12.  The

25 Employer's Return, quite properly, did not say the writ was
ineffective and did say the writ was not being returned.

26    "The employer's return indicated that a previously served

27 levy was pending.  <u>Procedurally, the writ should have been</u>
<u>returned to the sheriff and would have expired</u>."  Response of

28 Winn Law Group, p.2, *ll*.9-11 (emphasis supplied).  Wrong again.

1    attorneys' fees are in order pursuant to § 362(k)(1).

2        This court is also persuaded that this situation presents

3    § 362(k)(1) "appropriate circumstances" for punitive damages.

4        Winn and Cavalry have conducted themselves in reckless or

5    callous disregard for the rights of the debtor and not in good

6    faith.  Goichman v. Bloom (In re Bloom), 875 F.2d 224, 228 (9th

7    Cir. 1989).

8        Upon being notified of the offending garnishments, they did

9    nothing that could be construed as a good faith response.  They

10   stonewalled debtor's counsel for nineteen days without excuse –

11   no response to her written notice, no response to her numerous

12   phone calls, no voluntary termination of the EWO.  It was only

13   under the compulsion resulting from mail service of the debtor's

14   sanctions motion, which had been filed on day sixteen, that they

15   terminated the EWO.  This delay caused two additional

16   garnishments to occur.  Callous disregard of the law and the

17   rights of the debtor is an understatement.

18       In this court, Winn and Cavalry have conspicuously failed to

19   address, explain, extenuate, or excuse their nineteen-day delay

20   in terminating the EWO.  They have misrepresented facts in their

21   papers.  They have misrepresented the law in their papers.

22       Notice of the possibility of punitive damages was given in

23   this court's Order to Show Cause.  Winn and Cavalry have

24   addressed the question in their responses and at the hearing.

25

26                                   B

27       Attorneys' fees and costs are claimed by debtor's counsel to

28   have been $4,500.00 as of August 20, 2019.  Winn has conceded

                                   21

that it will pay reasonable attorneys' fees and costs and raised no opposition to that sum.  The time reasonably necessary to prepare for and appear at the hearing in court warrants an additional $1,000.00.  Hence, the damages component attributable to attorneys' fees and costs is $5,500.00.

There is no dispute that the amount actually garnished was $883.35.  Winn has documented $165.37 in refunds to the debtor.

Actual damages include emotional distress.  <u>Dawson v. Wash. Mutual Bank (In re Dawson)</u>, 390 F.3d 1139, 1146 (9th Cir. 2004).

The declaration by Mr. LeGrand, prepared on July 18, 2019, in the midst of the garnishments describes how they were posing a hardship.  He and his family, including three young children at home, were living on a tight budget that was being thrown into deficit by the garnishments.  He was worried about being able to pay rent and buy food.  The loss of those funds was proving "extremely stressful."  He expected a fresh start from bankruptcy but the unexpected garnishment forced him to spend a lot of time working with his attorney; the whole situation was "stressful" and "terrible."  Declaration of Debtor, Dkt. 23 (7/18/19).

The length of the period of the garnishments from May 22 and through August 7 necessarily imposed some emotional distress on an individual wage earner trying to support a family on a tight budget while working an average of twenty-three hours of overtime per week.  That continuing emotional distress must have been aggravated by the nineteen-day stonewall by Cavalry and Winn.

Some confirmation of stress and disruption inflicted on the debtor comes from the observation in a filing of August 20, 2019, by his counsel, who is essentially a solo practitioner, that "a

significant amount of time" had been consumed communicating with

her client "far more than initially anticipated."  Motion of

Sanctions for Violations of Automatic Stay, p.3, *ll*.2-3.  It is a

fact of law practice that representing individuals in matters

such as bankruptcy entails a considerable amount of time spent

helping to calm the fears of clients.

This court is persuaded by a preponderance of evidence and

based on its assessment of the credibility of Mr. LeGrand, and

notwithstanding the absence of expert opinion evidence, that

there has been emotional distress deserving of compensation in

the amount of $3,500.00.

Accordingly, actual damages total $9,883.35.[22]

C

Punitive damages are authorized by § 362(k)(1) in

"appropriate cases."  As this court has previously explained,

this is a statutory form of punitive damages as to which Congress

has provided little guidance.  Sundquist, 566 B.R. at 609-14.

Case law regarding § 362(k)(1) establishes that there should

be some showing of reckless or callous disregard for the law or

for rights of others.  Bloom, 875 F.2d at 228.

That reckless-or-callous-disregard standard can be

established by conduct that is malicious, wanton, or oppressive.

Snowden, 769 F.3d at 657.

The Supreme Court in dealing with common law punitive

damages has installed three guideposts: (1) degree of

---

[22]A credit of $165.37 will be allowed against the judgment
for funds returned by Winn.

1   reprehensibility of the defendant's misconduct; (2) the disparity

2   between the actual or potential harm suffered by the plaintiff

3   and the punitive damages award; and (3) the difference between

4   the punitive damages awarded and civil penalties authorized or

5   imposed in comparable cases.  State Farm Mut. Automobile Ins. Co.

6   v. Campbell, 538 U.S. 408, 418 (2003); BMW of N. Am. Inc. v.

7   Gore, 517 U.S. 559, 575 (1996).

8       The nineteen-day stonewall tips the scales of

9   reprehensibility in this case.  Sophisticated debt collectors

10  plainly know the law regarding the bankruptcy automatic stay.

11  There is no explanation other than reckless or callous disregard

12  for the law for not immediately having terminated the EWO upon

13  learning of the stay violations.  Although Cavalry and Winn were

14  given full and fair opportunity to explain why they refused

15  promptly to respond to debtor's counsel and did nothing until

16  after the debtor filed and served the motion for sanctions, they

17  say nothing about that period and implicitly equate nineteen days

18  and two additional garnishments with "immediate" action.

19      An award of approximately two and one half times the actual

20  damages will be proportional and within traditional bounds.

21      Comparable cases in matters such as the Fair Debt Collection

22  Act, in which the majority are attorneys' fee awards, regularly

23  exceed that which is being awarded here as punitive damages.

24      Hence, punitive damages are awarded under § 362(k)(1) in the

25  amount of $25,000.00.

26

27                              VI

28      Finally, Winn contends that Cavalry should not be held

liable for any award because Winn, as Cavalry's counsel, is the party that did not terminate the EWO when it should have done so upon learning of the bankruptcy filing.

It is, however, long settled law that clients are held accountable for the acts and omissions of their attorneys. <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 396-97 (1993); <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 633-34 (1962); <u>Smith v. Ayer</u>, 101 U.S. 320, 325-26 (1879).

Cavalry and Winn are sophisticated debt collectors who know and are expected to comply with bankruptcy law. The acts and omissions of Winn in this case were on behalf of Cavalry, the party that reviewed the notice of bankruptcy and directed that the file be closed. There is nothing unfair about holding both Cavalry and Winn accountable. To the extent they disagree, they remain free to allocate the consequences among themselves.

*\*\**

Cavalry and Winn willfully violated the automatic stay and pursuant to 11 U.S.C. § 362(k)(1) are jointly and severally liable for $34,883.35, consisting of actual damages of $9,883.35 and punitive damages of $25,000.00.

Dated: February 06, 2020

_____

United States Bankruptcy Judge

25

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

     The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Dumace Leonard LeGrand
7811 Sumersdale Dr., #170
Sacramento, CA 95823

Susan J. Turner
331 J Street #200
Sacramento, CA 95814

Laura McCarthy Hoalst
Winn Law Group
110 East Wilshire Avenue, Suite 212
Fullerton, CA 92832-1960

Douglas M. Whatley
PO Box 538
Folsom, CA 95763-0538